## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *MAXIM HEALTHCARE STAFFING SERVICES, INC.,* §<br>§<br>§ | | |
| *Plaintiff,* §<br>§ | | **Civil Action No. 5:21-cv-01100** |
| v. §<br>§ | | _____ |
| *THOMAS MATA & NUWEST GROUP HOLDINGS, LLC,* §<br>§<br>§ | | **JURY TRIAL DEMANDED** |
| *Defendants* § | | |

### MAXIM HEALTHCARE STAFFING SERVICES, INC.'S COMPLAINT

Plaintiff Maxim Healthcare Staffing Services, Inc. ("Maxim") files this Complaint seeking emergency injunctive relief and other relief ("Complaint") against Defendants Thomas Mata ("Mata") and NuWest Group Holdings, LLC ("NuWest"). Maxim shows the following in support of its Complaint:

## I.
## INTRODUCTION

This case presents the quintessential example of an individual (here, Mata) and his new employer (here, NuWest) engaging in corporate misconduct by misappropriating trade secrets and breaching a restrictive covenant agreement to gain an unfair advantage over an industry competitor (here, Maxim).

As recently as September 2021, Mata worked for Maxim as the Senior Programs Manager in its Strategic Solutions division. In that role, Mata maintained extensive responsibility over bids that Maxim submitted on large government contracts—including a significant open contract for which Maxim is presently bidding with the U.S.

Immigration and Customs Enforcement ("ICE") Health Service Corps ("IHSC").  During summer 2021, Mata was applying for a promotion within Maxim while, at the same time, applying for jobs outside of Maxim.  While Mata was transmitting copies of his updated resume and unofficial transcript—and presumably while he was attempting to secure employment with NuWest (a direct competitor of Maxim)—Mata downloaded and emailed himself numerous documents that include confidential and trade secret information relating to Maxim's active bid for an ICE/IHSC contract.  Maxim did not authorize Mata's theft of this confidential and trade secret information and has since demanded its immediate return.  Mata never returned this information.

Only weeks later, Mata ended his employment with Maxim and took the stolen confidential and trade secret information to NuWest.  Based on information provided by NuWest, NuWest is currently bidding on the same ICE/IHSC contract on which Maxim is bidding, on which Mata worked during his employment with Maxim, and for which Mata stole Maxim's confidential and trade secret information.  NuWest also hired Mata into a position that is substantially similar to the position that he occupied with Maxim, in flagrant breach of the noncompete and nonsolicitation covenants in the Employment and Mutual Arbitration Agreement (the "Agreement")[1] Mata signed with Maxim.

Although NuWest recently represented to Maxim that Mata has "formally separated from employment with NuWest" as a result of Maxim bringing this action,

---

[1] A true and correct copy of the Agreement is attached as Exhibit 1.  While titled an Employment and Mutual *Arbitration* Agreement, the scope of the arbitration provision in the Agreement expressly excludes claims "that Maxim may have against [Mata] for temporary or preliminary or permanent injunctive relief (including a temporary restraining order) which are based on the claims of unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information[.]" Agreement § 12(b).  The claims asserted in this lawsuit accordingly fall outside the scope of the arbitration provision of the Agreement.

neither Mata nor NuWest can unring this bell of their unlawful activity. Mata and NuWest wrongfully possess Maxim's confidential and trade secret information and remain in positions to use them against Maxim. Accordingly, Maxim seeks immediate injunctive relief to prevent Mata and NuWest from causing and threatening to cause Maxim irreparable harm. Such relief is appropriate—and necessary.

## II.
## PARTIES

1.      Plaintiff Maxim Healthcare Staffing Services, Inc. is a foreign for-profit corporation organized under Maryland law and registered to do business in Texas. Maxim's headquarters is located at 7227 Lee Deforest Drive, Columbia, Maryland 21046.

2.      Defendant NuWest Group Holdings, LLC is a limited liability company organized and existing under Washington law. NuWest, like Maxim, provides staffing services to the healthcare industry and is thus a direct competitor of Maxim. Although NuWest has not registered to do business in Texas, NuWest recently hired Mata who, upon information and belief, was working remotely and thus doing business on behalf of NuWest at his residence in Kendall County, Texas. NuWest may be served through its registered agent, TA Group Holdings, at 275 118th Ave. S.E., Ste. 200, Bellevue, Washington 98005.

3.      Defendant Thomas Mata is an individual residing in Kendall County, Texas whose last-known residence is 106 Bent Tree Drive, Boerne, Texas 78006. Mata may be served with process at his residence or wherever he may be found.

## III.
## JURISDICTION AND VENUE

4.      This Court has federal-question jurisdiction over Maxim's cause of action under the Defend Trade Secrets Act ("DTSA") pursuant to 28 U.S.C. § 1331. This Court

has supplemental jurisdiction over Maxim's cause of action under the Texas Uniform Trade Secrets Act ("TUTSA") and its other state-law claims pursuant to 28 U.S.C. § 1367.

5.      This Court maintains general personal jurisdiction over Mata because he is a Texas resident.

6.      This Court has personal jurisdiction over NuWest because NuWest purposely and contractually availed itself of the privileges and benefits of conducting business in Texas.  NuWest hires Texas residents, offers services in Texas, and, upon information and belief, entered into contracts with Texas residents that are to be substantially performed in Texas.  Additionally, in connection with its employment of Mata and unlawful competition against Maxim, NuWest acquired trade secrets that were misappropriated in Texas and NuWest interfered with the restrictive covenants in Mata's Agreement, which was executed by Mata in Texas and requires performance by Mata in Texas.  Additionally, according to publicly available information, NuWest has employees in at least Corpus Christi, Frisco, Schertz, Austin, and Pflugerville.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claims occurred in this District.  Venue is also proper in this division pursuant to 28 U.S.C. § 124(d)(4).

## IV.
## PROCEDURAL POSTURE

8.      Maxim sued NuWest and Mata in Kendall County District Court (the "state court") on October 19, 2021—in case number 21-664—bringing causes of action for trade secret misappropriation under TUTSA, breach of contract, and tortious interference with contract, and seeking, among other things, a temporary restraining order ("TRO") and a temporary injunction.

9.     The state court issued a TRO against NuWest and Mata on October 26, 2021.  Specifically, the court enjoined NuWest from "using or divulging, or threatening to use or divulge, for any reason, Maxim's trade secrets and confidential information obtained from Mata or acquired by Mata from Maxim."  The court also entered a TRO enjoining Mata from: (1) "using or divulging, or threatening to use or divulge, for any reason, Maxim's trade secrets and confidential information"; (2) "directly or indirectly approaching, contacting, soliciting, or inducing any client or customer of Maxim to enter into a business relationship with Mata or any company for which Mata works, including NuWest, about which Mata obtained knowledge by reason of Mata's employment with Maxim"; and (3) "becoming employed in violation of the noncompete covenant included in his Employment and Mutual Arbitration Agreement."

10.    At the October 26, 2021 hearing, the state court also heard argument on Maxim's motion for expedited discovery, which Maxim filed the same day that it filed its Petition and TRO Application against Mata and NuWest.  The court ultimately took the matter under advisement and instructed Maxim to submit its proposed written-discovery requests on Friday, October 29, noting that it would not be able to review or rule on them sooner.  The court also noted that it would rule on the motion for expedited discovery by Monday, November 1.

11.    In line with the state court's instruction, on October 29 Maxim filed its proposed written-discovery requests for both defendants.

12.    On November 5, four days after the date on which a ruling was supposed to occur—and only four days before the hearing on Maxim's motion for a temporary injunction—Maxim's discovery motion had not yet been ruled on.  It also remains unclear which judge has taken the matter under advisement.

5

13.     Given the busy docket in Kendall County, the uncertainty surrounding when Maxim would receive a ruling on its motion for expedited discovery, and the exigent circumstances present in this case, Maxim now seeks relief in this Court.

**V.**
**FACTUAL BACKGROUND**

**A.     Maxim Healthcare Staffing Services, Inc.**

14.     Maxim maintains operations in numerous Texas cities, including the major cities of Dallas, Fort Worth, Austin, Houston, and San Antonio.

15.     Maxim is a leader in the highly competitive business of recruiting and providing medical personnel on a temporary or permanent basis to facilities such as hospitals, nursing homes, government facilities, and other medical and healthcare facilities.   Among other clients, Maxim contracts with numerous federal agencies to provide healthcare staffing.

16.     Over time, and after expending significant resources and effort, Maxim has developed and maintains confidential and trade secret information that provides it a distinct advantage over its competitors in the industry.   This confidential and trade secret information includes, but is not limited to, information related to Maxim's:

a.   Financial affairs;

b.   Sales and marketing strategies;

c.   Contract reviews;

d.   Compliance matrices;

e.   Pricing and costs;

f.   Workflow briefs;

g.   Project management reports;

6

h.   Customer contact information;

i.   Customer staffing requirements;

j.   Customer margin tolerances;

k.   Forms for acquiring and recording information;

l.   Financial controls;

m.   Management practices; and

n.   Procedures and processes.

17.     This information, as well as other confidential and trade secret information of Maxim, is not available through proper means to the public or to Maxim's competitors. It is also reasonably safeguarded by Maxim through password-protected computers; company-specific and password-protected intranet platforms; information security policies; a code of conduct; and employment agreements that include nondisclosure and other restrictive covenants, as detailed below.

**B.    Maxim's Employment of Mata**

18.     In January 2017, Maxim hired Mata as a Senior Program Manager in its Strategic Solutions division.  Mata worked for Maxim out of its office and his residence in the Greater San Antonio Area.

19.     Mata maintained extensive responsibility over bidding on and servicing large government contracts that Maxim secured and was servicing during Mata's tenure. One such government contract was with ICE/IHSC and concerns the provision of daily healthcare services to individuals housed at designated facilities across the country. Maxim has provided services at a number of these facilities and is currently bidding on a contract to provide additional services at numerous others.

20.     Mata was directly involved in servicing a four-year contract with ICE/IHSC

that began in or around 2014 and ended in or around 2018.  In connection with the ICE/IHSC contract, Mata was the lead project manager on the contract and thus received and developed confidential and trade secret information related to Maxim servicing the contract; received and developed confidential and trade secret information related to Maxim's business development strategy for procuring additional contracts from ICE/IHSC; and maintained relationships with key points-of-contact within ICE/IHSC. On his LinkedIn profile, Mata highlights his experience with the ICE/IHSC contract, noting that he "facilitate[ed] [] clinical process management with adherence to IHSC [p]olicies, [p]rocedures, [d]irectives, and accreditation standards prescribed by ICE/IHSC."[2]  Mata was involved with Maxim closing out the ICE/IHSC contract in or around 2018.

21.    Naturally, Mata then became a key member of the Maxim team that developed strategies to submit bids on additional and ongoing contracts with ICE/IHSC. As part of this team, Mata reported directly to Jason Nicholas—National Director of Operations, SS&O—who oversees and manages Maxim's top-level contracts, including the ICE/IHSC contract.  In connection with the ICE/IHSC contract, Mata participated in numerous conversations about Maxim's performance under prior contracts, business development strategies for future contracts, and Maxim's written responses to ICE/IHSC feedback that Maxim ultimately sent to program-level decisionmakers within ICE/IHSC.

22.    Mata also received extensive and largely unfettered access to Maxim's confidential and trade secret information related to other large contracts that Maxim services and for which it continues to submit bids.  As with the ICE/IHSC contracts, Mata

_____

[2] A true and correct copy of Mata's LinkedIn profile is attached hereto as Exhibit 2.

was a vital member of the Maxim team that crafted business development strategies for obtaining work on these other large government contracts. Mata continued working on Maxim's top-level accounts for approximately two years until his separation from Maxim.

## C.   Restrictive Covenants under Mata's Agreement

23.    In connection with Maxim's emphasis on protecting its confidential and trade secret information, as well as its emphasis on protecting its business relationships, Maxim required Mata to sign his Agreement as a condition of his employment.

24.    By signing the Agreement, Mata acknowledged that, in his employment with Maxim, "and in performance of this Agreement, [he] will acquire certain non-public trade secrets, confidential information and information concerning customer or client relationships of Maxim, the public disclosure of which would cause financial loss and irreparable injury to Maxim."[3]

25.    To this end, Mata agreed not to divulge "Confidential Information" or "Trade Secrets" "except as required by the proper performance of his[] duties for Maxim or authorized by law[.]"[4] The Agreement defines "Confidential Information" to include "information not generally known by Maxim's competitors or the public concerning Maxim[.]"[5] This includes, but is not limited to: "its financial affairs, sales and marketing strategy, acquisition plan, pricing and costs, its customer's addresses and telephone numbers, contact persons, staffing requirements, [and] margin tolerances regarding pricing[.]"[6] The Agreement defines "Trade Secrets" consistent with that term under

---

[3] Ex. 1 at 1.

[4] *Id*. § 4.

[5] *Id*.

[6] *Id*.

TUTSA to include "information that Maxim takes measures to keep secret and that gives Maxim an advantage over its competitors[.]"[7]

26.    Mata also agreed that, upon termination of his employment with Maxim for whatever reason, he would "return to Maxim all original and copies of records, papers, and other property (whether on paper, computer discs or other form) belonging or pertaining to Maxim."[8]

27.    Mata also agreed that, from the termination of his employment and for an eighteen-month period thereafter, and within a fifty mile radius of the office or offices that he worked at the time of termination or the two-year period before, he "shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of Maxim's Business in which [he] performed work during the two (2) year period preceding his[] termination of employment."[9]

28.    Mata further agreed, from the termination of his employment and for an eighteen-month period thereafter, "not to[,] on behalf of him[self] or any other person or entity, approach, contact, solicit, or induce any individual, corporation or other entity which is a client or customer of Maxim, about which [he] obtained knowledge by reason of [his] employment by Maxim to: (i) enter into any business relationship with a client or customer of Maxim if the business relationship is competitive with any aspect of Maxim's Business in which [he] worked during the two (2) year period preceding termination of employment; or (ii) reduce or eliminate the business such client or customer conducts

---

[7] *Id.*

[8] *Id.* § 8.

[9] *Id.* § 5.

with Maxim."[10]

29.     Mata further acknowledged under the Agreement that "irreparable damage will result to Maxim in the event of the violation" of the nondisclosure, noncompete, and nonsolicitation covenants referenced above.[11]

**D.     Mata's Resignation from Maxim and Breach of His Legal Duties**

30.     During summer 2021, Mata applied for a promotion within Maxim.  Upon information and belief, Mata was contemporaneously applying for positions with Maxim's competitors, including NuWest, a healthcare staffing firm that supports commercial and government contracts in direct competition with Maxim.  Maxim did not select Mata for the promotion.

31.     Based on Mata's employment with NuWest, Mata received an offer from NuWest.

32.     While Mata was transmitting copies of his updated resume and unofficial transcript, and presumably while he was attempting to secure an offer from NuWest, Mata stole confidential and trade secret information related to Maxim's ongoing procurement efforts for a contract with ICE/IHSC —an extension of the same contract on which he worked with Maxim and about which he boasts on his LinkedIn profile.

33.     While Maxim's investigation is ongoing, Maxim has confirmed that the documents Mata stole include operational models, program management strategies, and financial and data reports related to the ICE/IHSC contract.  These documents also include compliance matrices that Maxim has developed and that ICE/IHSC now require

---

[10] *Id*. § 6.

[11] *Id*. § 10.

in receiving bids; performance data related to daily and weekly personnel standards; financial data associated with tracking performance standards; and potential areas for continuous improvement.  These documents further include PowerPoints that detail Maxim's processes and procedures for servicing large contracts as well as Maxim's new wins, contract renewals, and developments.  Maxim did not authorize Mata's theft of this confidential and trade secret information and Mata never returned this information (nor did he ever inform Maxim of his theft of the information).

34.     Rather, weeks after Mata stole this information, Mata ended his employment with Maxim and took the stolen confidential and trade secret information to NuWest.  NuWest is bidding on the same ongoing ICE/IHSC contract on which Maxim is bidding, on which Mata worked during his employment with Maxim, and for which Mata stole Maxim's confidential and trade secret information.  NuWest now has Maxim's playbook not only from prior seasons, but also for the very next game.  With this information, NuWest could use Maxim's confidential and proprietary information against Maxim on its bidding for the ICE/IHSC contract or attempt to further build-off Maxim's work to offer a superior proposal to ICE/IHSC.

35.     Also, upon information and belief, NuWest employed Mata in a position that is substantially similar to the position that he occupied with Maxim.  Upon information and belief, Mata worked for NuWest out of his residence in the Greater San Antonio Area.  After Maxim filed its state-court petition against Mata and NuWest, NuWest terminated Mata's employment in an apparent attempt to distance itself from his unlawful conduct.  NuWest and Mata later stated in open court that Mata is no longer employed by NuWest.

36.     Upon information and belief, Mata and NuWest have used and will continue

to use the information Mata stole to harm Maxim in bids for the ICE/IHSC contract. Unless Mata and NuWest are stopped, Maxim will continue to be irreparably harmed.

**VI.**
**CAUSES OF ACTION**

**A.     Trade Secret Misappropriation under the Defend Trade Secrets Act (Mata and NuWest)**

37.     Maxim incorporates the allegations set forth above as if set forth at length below.

38.     Maxim has spent substantial financial resources developing and maintaining the secrecy of its trade secrets for its exclusive benefit.  Maxim's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by Maxim's competitors or their employees, specifically including NuWest and its employees.  Maxim does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

39.     Through his employment with Maxim, Mata acquired Maxim trade secrets, as that term is defined under the DTSA, specifically including operational models, program management strategies, and financial and data reports.  18 U.S.C. § 1839(3) (trade secrets include all forms and types of information, including, among other information, business information, financial data, and lists of actual or potential customers or suppliers).

40.     Maxim provided its trade secrets to Mata in confidence and with the understanding that Mata would use Maxim's trade secrets solely to perform his responsibilities with Maxim.  Mata knew that Maxim intended for all such trade secrets to remain confidential and to be used solely to perform his responsibilities with Maxim.

13

41.     Mata has misappropriated, and threatens to continue to misappropriate, Maxim's trade secrets in violation of the DTSA.  In anticipation of his employment with NuWest, and in the months and weeks before ending his employment with Maxim, Mata misappropriated trade secrets related to Maxim's procurement efforts for the ICE/IHSC contract at issue.  And while the full extent of Mata's misappropriation is known only by Mata, and possibly NuWest, there is no dispute that Mata stole from Maxim operational models, program management strategies, and financial and data reports related to the project.

42.     Upon information and belief, after Mata sole these trade secrets and started his employment with NuWest, NuWest placed Mata in a position in which he was involved in bidding on the ICE/IHSC contract for NuWest and used Maxim's trade secrets to do so.   Because Mata and NuWest misappropriated Maxim's trade secrets and are threatening to continue doing so, Mata and NuWest have violated and threaten to continue violating the DTSA.

43.     The misappropriation by Mata and NuWest has been and continues to be willful and malicious, as evidenced by Mata's actions in the months and weeks leading up to his resignation from Maxim and NuWest's employment of Mata—including after learning of Mata's illegal actions—until after Maxim filed suit against NuWest.

44.     As a direct and proximate result of the conduct by Mata and NuWest, Maxim has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

45.     Unless enjoined, Mata's and NuWest's misappropriation and threatened misappropriation of Maxim's trade secrets will cause irreparable harm and continued irreparable harm to Maxim, for which it cannot be fully and adequately compensated

unless Mata and NuWest are enjoined as requested.

**B.     Trade Secret Misappropriation under the Texas Uniform Trade Secrets Act (Mata and NuWest)**

46.     Maxim incorporates the allegations set forth above as if set forth at length below.

47.     Maxim has spent substantial financial resources developing and maintaining the secrecy of its trade secrets for its exclusive benefit.  Maxim's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by Maxim's competitors or their employees, specifically including NuWest and its employees.  Maxim does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

48.     Through his employment with Maxim, Mata acquired Maxim trade secrets, as that term is defined under TUTSA, specifically including operational models, program management strategies, and financial and data reports.  Tex. Civ. Prac. and Rem. Code § 134A.002(6) (trade secrets include all forms and types of information, including, among other information, business information, financial data, and lists of actual or potential customers or suppliers).

49.     Maxim provided its trade secrets to Mata in confidence and with the understanding that Mata would use Maxim's trade secrets solely to perform his responsibilities with Maxim.  Mata knew that Maxim intended for all such trade secrets to remain confidential and to be used solely to perform his responsibilities with Maxim.

50.     Mata has misappropriated, and threatens to continue to misappropriate, Maxim's trade secrets in violation of TUTSA.  In anticipation of his employment with

NuWest, and in the months and weeks before ending his employment with Maxim, Mata misappropriated trade secrets related to Maxim's procurement efforts for the ICE/IHSC contract at issue.  And while the full extent of Mata's misappropriation is known only by Mata, and possibly NuWest, there is no dispute that Mata stole from Maxim operational models, program management strategies, and financial and data reports related to the project.

51.    Upon information and belief, after Mata stole these trade secrets and started his employment with NuWest, it is believed that NuWest placed Mata in a position in which he was involved in bidding on the ICE/IHSC contract for NuWest and used Maxim's trade secrets to do so.  Because Mata and NuWest misappropriated Maxim's trade secrets and are threatening to continue doing so, Mata and NuWest have violated and threaten to continue violating TUTSA.

52.    The misappropriation by Mata and NuWest has been and continues to be willful and malicious, as evidenced by Mata's actions in the months and weeks leading up to his resignation from Maxim and NuWest's employment of Mata—including after learning of Mata's illegal actions—until after Maxim filed suit against NuWest.

53.    As a direct and proximate result of the conduct by Mata and NuWest, Maxim has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

54.    Unless enjoined, Mata's and NuWest's misappropriation and threatened misappropriation of Maxim's trade secrets will cause irreparable harm and continued irreparable harm to Maxim, for which it cannot be fully and adequately compensated unless Mata and NuWest are enjoined as requested.

## C.    Breach of Contract – Nondisclosure Covenants (Mata)

55.     Maxim incorporates the allegations set forth above as if set forth at length below.

56.     Mata entered into the Agreement as a condition of his employment with Maxim.

57.     The Agreement includes a nondisclosure provision under which Mata agreed that he would not divulge Maxim's Confidential Information or Trade Secrets, as those terms are defined by the Agreement, except as required by the proper performance of his duties for Maxim or authorized by law.  Mata also agreed that, upon the termination of his employment with Maxim, he would return all records, papers, and other property that belong or pertain to Maxim.

58.     Mata has breached his disclosure and return-of-records covenants by downloading and emailing himself Maxim documents that include Confidential Information and Trade Secrets; failing to return those documents upon the termination of his employment with Maxim; and, instead, taking those documents to NuWest, where he occupied a position in which he was involved in bidding on the ICE/IHSC contract for NuWest and used Maxim's Confidential Information and Trade Secrets to do so.

59.     Maxim has suffered damages and will continue to suffer damages as a direct and proximate consequence of the breaches and anticipated breaches of Mata's nondisclosure obligations, as well as the breach of his return-of-records obligation. Accordingly, Maxim is entitled to recover compensatory and consequential damages.

60.     Maxim is also entitled to prospective injunctive relief to prevent Mata from further disclosing Maxim's Confidential Information and Trade Secrets, as agreed to under his Agreement.  Maxim is further entitled to its attorneys' fees incurred in enforcing its rights under the Agreement, plus additional sums in the event of an appeal.

**D.     Breach of Contract – Customer Nonsolicitation Covenant (Mata)**

61.     Maxim incorporates the allegations set forth above as if set forth at length below.

62.     Mata entered into the Agreement as a condition of his employment with Maxim.

63.     The Agreement includes an express customer nonsolicitation provision prohibiting Mata, for an eighteen-month period after his separation from Maxim, from approaching, contacting, soliciting, or inducing any client or customer of Maxim to enter into a business relationship with Mata or any company for which Mata works, such as NuWest.

64.     Upon information and belief, Mata breached the customer nonsolicitation covenant in his Agreement by participating in NuWest's bid on the very ICE/IHSC contract on which Mata worked during his employment with Maxim and for which Mata stole Maxim's confidential and trade secret information.

65.     Maxim has suffered damages and will continue to suffer damages as a direct and proximate consequence of the breaches and anticipated breaches of Mata's client nonsolicitation covenants.  Accordingly, Maxim is entitled to recover compensatory and consequential damages.

66.     Maxim is also entitled to prospective injunctive relief to prevent Mata from further soliciting other Maxim clients, as agreed to under his Agreement.  Maxim is further entitled to its attorneys' fees incurred in enforcing its rights under the Agreement, plus additional sums in the event of an appeal.

**E.     Breach of Contract – Noncompete Covenant (Mata)**

67.     Maxim incorporates the allegations set forth above as if set forth at length

below.

68.     Mata entered into the Agreement as a condition of his employment with Maxim.

69.     The Agreement includes an express noncompete provision prohibiting Mata, for an eighteen-month period after his separation from Maxim, and within a fifty-mile radius of where he worked for Maxim, from directly or indirectly engaging in or preparing to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of Maxim's business in which Mata performed work during the two-year period preceding his termination of employment.

70.     Mata breached the noncompete covenant in his Agreement by becoming employed with NuWest, a direct competitor of Maxim, in a position that was substantially similar, if not identical, to the position that he maintained with Maxim.  Moreover, in connection with his employment with NuWest, Mata participated in NuWest's bid on the same ongoing ICE/IHSC contract on which Maxim is bidding, on which Mata worked during his employment with Maxim, and for which Mata stole Maxim's confidential and trade secret information.  Upon information and belief, Mata physically worked for NuWest within a fifty-mile radius of where he physically worked for Maxim.

71.     Maxim has suffered damages and will continue to suffer damages as a direct and proximate consequence of the breaches and anticipated breaches of Mata's noncompete covenants.  Accordingly, Maxim is entitled to recover compensatory and consequential damages.

72.     Maxim is also entitled to prospective injunctive relief to prevent Mata from further breaching his noncompete covenant, as agreed to under his Agreement.  Maxim is further entitled to its attorneys' fees incurred in enforcing its rights under the

Agreement, plus additional sums in the event of an appeal.

**F.     Tortious Interference with Contract (NuWest)**

73.     Maxim incorporates the allegations set forth above as if fully detailed below.

74.     Mata entered into the Agreement as a condition of his employment with Maxim, which includes valid and enforceable restrictive covenants.

75.     Upon information and belief, NuWest knew about or had reason to know about the valid and enforceable restrictive covenants in the Agreement before hiring Mata.  It is beyond any dispute that NuWest knew about the valid and enforceable restrictive covenants in the Agreement for several days prior to Maxim filing suit in state court, but chose not to terminate Mata until Maxim filed suit.  Upon information and belief, despite this knowledge, NuWest hired Mata in a position that required him to breach the covenants in his Agreement by performing substantially similar responsibilities for nearly identical clients as those that he serviced with Maxim.  Even after Maxim expressly informed NuWest that Mata stole Maxim information and that its employment of Mata in his current role violates his nondisclosure and noncompete covenants, NuWest employed Mata for several days and, ***to this day***, has still provided *no assurances* that it has taken steps to ensure it is not relying upon confidential information and materials illegally taken by Mata from Maxim.

76.     NuWest's interference with Mata's Agreement has been willful and intentional, without legal right or privilege, and designed to interfere with Maxim's contractual relations with Mata.

77.     NuWest's interference with Mata's Agreement has proximately caused injury to Maxim.

## VII.
## REQUEST FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

78.     Unless immediately restrained, Mata and NuWest will cause further irreparable harm to Maxim for which there is no adequate remedy at law.  As detailed in the motion that Maxim is contemporaneously filing with this Complaint, Maxim is entitled to a temporary restraining order, temporary injunction, and permanent injunction:

a)     Restricting Mata from directly or indirectly using or divulging, or threatening to use or divulge, for any reason, Maxim's trade secrets and/or confidential information;

b)     Restricting NuWest from directly or indirectly using or divulging, or threatening to use or divulge, for any reason, Maxim's trade secrets and/or confidential information obtained from Mata or acquired by Mata from Maxim;

c)     Restricting Mata from directly or indirectly approaching, contacting, soliciting, or inducing any client or customer of Maxim to enter into a business relationship with Mata or any company for which Mata works, including NuWest, about which Mata obtained knowledge by reason of Mata's employment with Maxim; and

d)     Restricting Mata from becoming employed in violation of the noncompete covenant included in his Employment and Mutual Arbitration Agreement.

## VIII.
## BOND

79.  Bond should be set at a reasonable amount.  Maxim seeks only to maintain the status quo by enforcing its agreements with Mata and preventing NuWest from unlawfully competing through Maxim's stolen trade secrets and confidential information, and to stop other ongoing unlawful activity.

## IX.
## CONDITIONS PRECEDENT

80.     All conditions precedent to Maxim's claims for relief have been performed or have occurred or were otherwise met, waived, or excused.

## X.
## JURY DEMAND

81.     Maxim demands a trial by jury as to all claims that may be tried to a jury.

## XI.
## PRAYER FOR RELIEF

82.     Furthermore, Maxim respectfully requests that the Court:

a.     Issue a temporary restraining order enjoining Mata and NuWest, as set forth above;

b.     Grant Maxim's Motion for Expedited Discovery, which Maxim has contemporaneously filed with this Complaint;

c.     After notice and a hearing, issue a preliminary injunction as requested above pending a trial on the merits;

d.     After a trial on the merits, issue a permanent injunction ordering specific performance of the restrictive covenants included in Mata's Agreement, as requested above;

e.     Award Maxim attorneys' fees and costs associated with this lawsuit; and

f.     Grant Maxim all other relief, in law and in equity, to which Maxim may be entitled.

Dated:  November 8, 2021                    Respectfully submitted,


                                           _/s/ Michael P. Jones_____
                                           Michael P. Jones
                                           michael.jones@morganlewis.com
                                           John P. Bramble
                                           john.bramble@morganlewis.com
                                           Morgan, Lewis & Bockius LLP
                                           1000 Louisiana St., Suite 4000
                                           Houston, TX 77002-5006
                                           (713) 890-5000 – Telephone
                                           (713) 890-5001 – Facsimile

                                           Lincoln Bisbee (pro hac
                                           forthcoming)
                                           lincoln.bisbee@morganlewis.com
                                           Morgan, Lewis & Bockius LLP
                                           101 Park Avenue
                                           New York, NY 10178-0060
                                           (212) 309-6104 – Telephone
                                           (212) 309-6001 – Facsimile

                                           ***ATTORNEYS FOR PLAINTIFF
                                           MAXIM HEALTHCARE
                                           STAFFING SERVICES, INC.***